## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARILYN HERNANDEZ, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>CARNIVAL CORPORATION,<br><br>     Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT - CLASS ACTION

Plaintiff Marilyn Hernandez ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against Defendant Carnival Corporation ("Defendant" or "Carnival"), and in support thereof alleges the following:

### INTRODUCTION

1.    This is a class action brought against Carnival for wiretapping the electronic communications of visitors to its website, www.carnival.com. Carnival procures third-party vendors, such as Microsoft Corporation, to embed snippets of JavaScript computer code ("Session Replay Code") on Carnival's website, which then deploys on each website visitor's internet browser for the purpose intercepting and recording the website visitor's electronic communications with the Carnival website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time ("Website Communications").    These third-party vendors (collectively, "Session Replay Providers") create and deploy the Session Replay Code at Carnival's request.

2.      After intercepting and capturing the Website Communications, Carnival and the Session Replay Providers use those Website Communications to recreate website visitors' entire visit to www.carnival.com. The Session Replay Providers create a video replay of the user's behavior on the website and provide it to Carnival for analysis. Carnival's procurement of the Session Replay Providers to secretly deploy the Session Replay Code results is the electronic equivalent of "looking over the shoulder" of each visitor to the Carnival website for the entire duration of their website interaction.

3.      Carnival's conduct violates the Maryland Wiretapping and Electronic Surveillance Act, Md. Code Ann., Cts. & Jud. Proc. § 10-401 and constitutes an invasion of the privacy rights of website visitors.

4.      Plaintiff brings this action individually and on behalf of a class of all Maryland citizens whose Website Communications were intercepted through Carnival's procurement and use of Session Replay Code embedded on www.carnival.com, as well as its subpages, and seeks all civil remedies provided under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, and attorneys' fees and costs.

## PARTIES

5.      Plaintiff Marilyn Hernandez is a citizen of the State of Maryland, and at all times relevant to this action, resided and was domiciled in the County of Baltimore, Maryland. Plaintiff currently resides and is domiciled in Maryland.

6.      Defendant Carnival Corporation is a corporation organized under the laws of Panama, and its principal place of business is in Miami, Florida. Defendant is a citizen of Florida.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including Plaintiff, is a citizen of a state different than Defendant.

8.      This Court has personal jurisdiction over Defendant because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in Maryland. The privacy violations complained of herein resulted from Defendant's purposeful and tortious acts directed towards citizens of Maryland while they were located within Maryland. At all relevant times, Defendant knew that its practices would directly result in collection of information from Maryland citizens while those citizens browse www.carnival.com. Defendant chose to avail itself of the business opportunities of marketing and selling its services in Maryland and collecting real-time data from website visit sessions initiated by Maryland citizens while located in Maryland, and the claims alleged herein arise from those activities.

9.      Carnival also knows that many users visit and interact with Carnival's websites while they are physically present in Maryland. Carnival's website servers are capable of collecting user location data from a user's device such that Carnival is continuously made aware that its website is being visited by people located in Maryland, and that such website visitors are being wiretapped in violation Maryland statutory and common law.

10.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.      Website User and Usage Data Have Immense Economic Value.**

11.      The "world's most valuable resource is no longer oil, but data."[1]

12.      Earlier this year, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[2] This information is valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[3]

13.      In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

14.      In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of

---

[1] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data.
[2] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, Business News Daily (Aug. 5, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.
[3] *Id.*
[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

Methodologies for Measuring Monetary Value."[5] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[6]

15.     OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [$2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[7]

**B.      Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

16.     Consumers are skeptical and are wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[8]

17.     Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[9] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[10]

---

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.
[6] *Id.* at 25.
[7] *Id.*
[8] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.
[9] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.
[10] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

18.     Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

19.     A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[11]

20.     Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[12]

21.     Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[13]

**C.      How Session Replay Code Works.**

22.     Session Replay Code, such as that implemented on www.carnival.com, enables website operators to record, save, and replay website visitors' interactions with a given website. The clandestinely deployed code provides online marketers and website designers with insights

---

[11] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.
[12] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.
[13] Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

into the user experience by recording website visitors "as they click, scroll, type or navigate across different web pages."[14]

23.     While Session Replay Code is utilized by websites for some legitimate purposes, it goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites. Unlike other online advertising tools, Session Replay Code allows a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or private sensitive data, sometimes even when the visitor does not intend to submit the data to the website operator, or has not finished submitting the data to the website operator.[15] As a result, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[16]

24.     Session Replay Code works by inserting computer code into the various event handling routines that web browsers use to receive input from users, thus intercepting the occurrence of actions the user takes. When a website delivers Session Replay Code to a user's browser, the browser will follow the code's instructions by sending responses in the form of "event" data to a designated third-party server. Typically, the server receiving the event data is controlled by the third-party entity that wrote the Session Replay Code, rather than the owner of the website where the code is installed.

---

[14] Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.

[15] *Id.*

[16] Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

25.     The types of events captured by Session Replay Code vary by specific product and configuration, but in general are wide-ranging and can encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website. In order to permit a reconstruction of a user's visit accurately, the Session Replay Code must be capable of capturing these events at hyper-frequent intervals, often just milliseconds apart. Events are typically accumulated and transmitted in blocks periodically throughout the user's website session, rather than after the user's visit to the website is completely finished.

26.     Unless specifically masked through configurations chosen by the website owner, some visible contents of the website may also be transmitted to the Session Replay Provider.

27.     Once the events from a user session have been recorded by a Session Replay Code, a website operator can view a visual reenactment of the user's visit through the Session Replay Provider, usually in the form of a video, meaning "[u]nlike typical analytics services that provide aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[17]

28.     Because most Session Replay Codes will by default indiscriminately capture the maximum range of user-initiated events and content displayed by the website, researchers have found that a variety of highly sensitive information can be captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on webpages.[18]

---

[17] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.
[18] *Id.*

29.     Most alarming, Session Replay Code may capture data that the user did not even intentionally transmit to a website during a visit, and then make that data available to website owners when they access the session replay through the Session Replay Provider. For example, if a user writes information into a text form field, but then chooses not to click a "submit" or "enter" button on the website, the Session Replay Code may nevertheless cause the non-submitted text to be sent to the designated event-response-receiving server before the user deletes the text or leaves the page. This information will then be viewable to the website owner when accessing the session replay through the Session Replay Provider.

30.     Session Replay Code does not necessarily anonymize user sessions, either.

31.     First, if a user's entry of personally identifying information is captured in an event response, that data will become known and visible to both the Session Replay Provider and the website owner.

32.     Second, if a website displays user account information to a logged-in user, that content may be captured by Session Replay Code.

33.     Third, some Session Replay Providers explicitly offer website owners cookie functionality that permits linking a session to an identified user, who may be personally identified if the website owner has associated the user with an email address or username.[19]

34.     Session Replay Providers often create "fingerprints" that are unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information. The resulting fingerprint, which is often unique to a user and rarely changes, are collected across all sites that the Session Replay Provider monitors.

---

[19] *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Sep. 8, 2022).

35.     When a user eventually identifies themselves to one of these websites (such as by filling in a form), the provider can then associate the fingerprint with the user identity and can then back-reference all of that user's other web browsing across other websites previously visited, including on websites where the user had intended to remain anonymous—even if the user explicitly indicated that they would like to remain anonymous by enabling private browsing.

36.     In addition to the privacy invasions caused by the diversion of user communications with websites to third-party Session Replay Providers, Session Replay Code also exposes website visitors to identity theft, online scams, and other privacy threats.[20] Indeed, "[t]he more copies of sensitive information that exist, the broader the attack surface, and when data is being collected [ ] it may not be stored properly or have standard protections" increasing "the overall risk that data will someday publicly leak or be breached."[21]

37.     The privacy concerns arising from Session Replay Code are not theoretical or imagined. The CEO and founder of LOKKER, a provider of data privacy and compliance solutions has said "[consumers] should be concerned" about the use of Session Replay Code because "they won't know these tools are operating 'behind the scenes' of their site visit" and "even if the company disclosed that they are using these tools, consumers wouldn't likely be able to opt-out and still use the site."[22]

---

[20] Juha Sarrinen, *Session Replay is a Major Threat to Privacy on the Web*, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.
[21] Lily Hay Newman, *Covert 'Replay Sessions' Have Been harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.
[22] Mark Huffner, *Is 'session replay software' a privacy threat or just improving your web experience*, Consumer Affairs (Oct. 25, 2022), https://www.consumeraffairs.com/news/is-session-replay-software-a-privacy-threat-or-just-improving-your-web-experience-102522.html.

38.     Indeed, the news is replete with examples of the dangers of Session Replay Code. For example, in 2019, the App Analyst, a mobile expert who writes about his analyses of popular apps, found that Air Canada's iPhone app wasn't properly masking the session replays they were sent, exposing unencrypted credit card data and password information.[23] This discovery was made just weeks after Air Canada said its app had a data breach, exposing 20,000 profiles.[24]

39.     Further, multiple companies have removed Session Replay Code from their websites after it was discovered the Session Replay Code captured highly sensitive information. For instance, in 2017, Walgreens stopped sharing data with a Session Replay Provider after it was discovered that the Session Replay provider gained access to website visitors' sensitive information.[25] Indeed, despite Walgreens' extensive use of manual redactions for displayed and inputted data, the Session Replay Provider still gained access to full names of website visitors, their medical conditions, and their prescriptions.[26]

40.     Following the Walgreens incident, Bonobos, a men's clothing retailer, announced that it was eliminating data sharing with a Session Replay Provider after it was discovered that the Session Replay Provider captured credit card details, including the cardholder's name and billing address, and the card's number, expiration, and security code from the Bonobos' website.[27]

41.     Recognizing the privacy concerns posed by Session Replay Code, in 2019 Apple required app developers to remove or properly disclose the use of analytics code that allow app

---

[23] Zach Whittaker, *Many Popular iPhone Apps Secretly Record Your Screen Without Asking*, TechCrunch (Feb. 6, 2019), https://techcrunch.com/2019/02/06/iphone-session-replay-screenshots/.

[24] *Id.*

[25] Nitasha Tiku, *The Dark Side of 'Replay Sessions' That Record Your Every Move Online*, WIRED (Nov. 16, 2017), https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/.

[26] Englehardt, *supra* note 17.

[27] Tiku, *supra* note 25.

developers to record how a user interacts with their iPhone apps or face immediate removal from the app store.[28] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[29]

**D.   Carnival Secretly Wiretaps its Website Visitors' Electronic Communications.**

42.    Carnival operates the website www.carnival.com, as well as all of its subpages. Carnival is a cruise line that offers cruise vacations throughout the United States and internationally.

43.    However, unbeknownst to the millions of individuals perusing Carnival's cruises and services online, Carnival willfully procures and embeds various Session Replay Codes from Session Replay Providers on its website to track and analyze website user interactions with www.carnival.com and its subpages.

44.    One such Session Replay Provider that Carnival procures is Microsoft.

45.    Microsoft is the owner and operator of a Session Replay Code titled Clarity, which provides basic information about website user sessions, interactions, and engagement, and breaks down users by device type, county, and other dimensions.[30]

46.    Clarity captures a user's interactions with a website, logging every website user's mouse movements and clicks, scrolling window resizing, user inputs, and more.[31] Indeed, Clarity

---

[28] Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.
[29] *Id.*
[30] Jono Alderson, *An Introduction to Microsoft Clarity*, Yoast, https://yoast.com/introduction-microsoft-clarity/#h-what-is-microsoft-clarity, (last visited Sep. 8, 2022).
[31] *Clarity Data Collection*, Microsoft, https://docs.microsoft.com/en-us/clarity/clarity-data, (last visited Aug. 24, 2022).

organizes the information it captures into over 30 different categories including: the date a user visited the website, the device the user accessed the website on, the type of browser the user accessed the website on, the operating system of the device used to access the website, the country where the user accessed the website from, a user's mouse movements, a user's screen swipes, text inputted by the user on the website, and how far down a webpage a user scrolls.[32] Clarity even provides a specific user ID to each website visitor so their website use and interactions can be monitored over time. [33]

47.    Similar to other Session Replay Code, the information collected and recorded by Clarity can then be used to play back a user's journey through a website, showing how they interacted with site navigation, calls to action, search features, and other on-page elements.[34] Put differently, the information Clarity captures can be translated into a simulation video of how a user interacts with a website.

48.    Clarity also uses the information captured to create detailed heatmaps of a website that provide information about which elements of a website have high user engagement, how far website users scrolled on the website, and the total clicks within a given area on the website. [35]

49.    Clarity offers websites three standard approaches when it comes to masking sensitive information collected from a user's interactions with a website—strict (all text entered by a user is purportedly masked), balanced (sensitive text entered into certain specifically pre-coded fields, such as passwords, and credit card information, is masked), and relaxed (no text

---

[32] *Filters Overview*, Microsoft (Jul. 26, 2022), https://docs.microsoft.com/en-us/clarity/clarity-filters.

[33] *Id.*

[34] Roger Montti, *Microsoft Clarity Analytics: Everything You Need to Know*, SEJ (Jan. 19, 2022), https://www.searchenginejournal.com/microsoft-clarity-analytics-overview/419311/#close.

[35] Haley Walden, *What is Microsoft Clarity? (& How Can it Improve SEO?)*, Elegant Themes (Jun. 12, 2022), https://www.elegantthemes.com/blog/wordpress/microsoft-clarity-improve-seo.

entered by a user is masked).[36] When Clarity is set to "relaxed," whatever information a user enters into the field on a website can be previewed in session recordings.[37] Additionally, Clarity enables websites to select specific elements and content to mask or unmask, customizing the standard masking approaches.[38]

50.     However, even when a website operator selects the "strict" and "balanced" settings, Clarity is nevertheless capable of collecting text entered by users, including text containing sensitive information.

51.     As such, Clarity collects highly personal information and substantive communications that can be tied to directly to a website user's identity as it monitors, records, and collects a website user's every move.

52.     Once Clarity's JavaScript is installed on a website, Clarity begins collecting website users' interactions within two hours of installation.[39] For website users who visit a website after Clarity has been installed, the wiretapping commences immediately on the visitor's web browser when the visitor loads the website in their browser.

53.     Data collected by Clarity is then stored in the Microsoft Azure cloud service and Microsoft has access to that information.[40]

---

[36] *Microsoft Clarity, An Essential Part of Customer Experience Optimization*, TechAir (Aug. 17, 2022), https://privacy.microsoft.com/en-US/privacystatement.
[37] *Id.*
[38] *Masking Content*, Microsoft (Jul. 18, 2022), https://docs.microsoft.com/en-us/clarity/clarity-masking.
[39] *Frequently Asked Questions*, Microsoft, https://docs.microsoft.com/en-us/clarity/faq, (last visited Aug. 24, 2022).
[40] *Id.*

54.     Carnival's procurement and use of Microsoft Clarity's Session Replay Code, and procurement and use of other Session Replay Codes through various Session Replay Providers, is a wiretap in violation Maryland statutory and common law.

**E.      Plaintiff's and Class Members' Experience.**

55.     Plaintiff has visited www.carnival.com and certain of its subpages on her computer while in Maryland prior to the filing of this action.

56.     While visiting Carnival's website, Plaintiff fell victim to Defendant's unlawful monitoring, recording, and collection of Plaintiff's Website Communications with www.carnival.com.

57.     Unknown to Plaintiff, Carnival procures and embeds Session Replay Code on its website.

58.     During a visit by Plaintiff to www.carnival.com and its subpages, Plaintiff browsed for cruise packages and looked at different destinations. Plaintiff communicated with Carnival's website by using her mouse to hover and click on certain links and items.

59.     During her visit to Carnival's website, the Session Replay Code instantaneously captured her Website Communications throughout her visit. Indeed, through Carnival's procurement of Session Replay Code, Plaintiff's Website Communications were automatically and secretly intercepted while using Carnival's website.

60.     Further, without her consent, Carnival procured Session Replay Providers to obtain certain information about her device, browser, and create a unique ID and profile for her.

61.     The Session Replay Codes operate in the same manner for all putative Class members.

62. Like Plaintiff, each Class member visited www.carnival.com and its subpages with Session Replay Code embedded in it, and those Session Replay Codes intercepted the Class members' Website Communications with www.carnival.com by sending hyper-frequent logs of those communications to Session Replay Providers.

63. Even if Carnival masks certain elements when it configures the settings of the Session Replay Code embedded on its website, any operational iteration of the Session Replay Code will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

64. For example, even with heightened masking enabled, Session Replay Providers will still learn through the intercepted data exactly which pages a user navigates to, how the user moves through the page (such as which areas the user zooms in on or interacted with), and additional substantive information.

**F.    Plaintiff and Class Members Did Not Consent to the Interception of Their Website Communications.**

65. Plaintiff and Class Members did not provide prior consent to Carnival's interception of their Website Communications, nor could they, as the interception begins *immediately* upon arriving at www.carnival.com.

66. As the 2017 study recognized, the extent of data collected by Session Replay Code "far exceeds user expectations [1]; text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user."[41]

67. Carnival does not ask website visitors, including Plaintiff and Class Members, for prior consent before wiretapping their Website Communications. Indeed, Plaintiff and Class

---

[41] Englehardt, *supra* note 17.

Members have no idea upon arriving at the Website that Carnival is using Session Replay Code to monitor, collect, and record their Website Communications because the Session Replay Code is seamlessly incorporated and embedded into Carnival's Website.

68.     Further, while Carnival maintains a "Privacy Policy," the Privacy Policy is insufficient for Plaintiff and Class Members to furnish prior consent. First, because the wiretapping begins the moment a website user visits www.carnival.com, Plaintiff and Class Members had no opportunity to review the Privacy Policy before they were wiretapped and therefore can only provide insufficient and subsequent consent after the wiretapping has already occurred.

69.     Moreover, a reasonable person would not be on notice of the terms of Carnival's Privacy Policy by way of normal interaction with the website. Carnival's Privacy Policy is contained on the homepage of www.carnival.com, buried at the very bottom of the website in non-contrasting font that is unobtrusive and easy to overlook. As such a reasonable person could browse Carnival's website without ever being on notice of the purported Privacy Policy.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons in Maryland whose Website Communications were captured through the use of Session Replay Code embedded in www.carnival.com.

71.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

72.     **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members and their identities may be obtained from the books and records of Carnival or the Session Replay Providers.

73.     **Commonality:** This action involves questions of law and fact that are common to the Class members. Such common questions include but are not limited to: (a) whether Defendant procures Session Replay Providers to intercept Carnival's website visitors' Website Communications; (b) whether Carnival willfully discloses the intercepted Website Communications of its website users; (c) whether Defendant acquires the contents of website users' Website Communications without their consent; (d) whether Defendant's conduct violates Maryland Wiretap Act, Md. Code Ann., Cts. & Jud. Proc. § 10-401, *et seq.*; (e) whether Plaintiff and the Class members are entitled to equitable relief; and (f) whether Plaintiff and the Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

74.     **Typicality:** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the Class had their communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the Class typical of one another.

75.     **Adequacy of Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant

has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the interests of the other members of the Class.

76. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

77. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant intercepted Plaintiff's and Class members' Website Communications, then Plaintiff and each Class member suffered damages by that conduct.

78. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified through Carnival's books and records or the Session Replay Providers' books and records.

**COUNT I**
**Violation of Maryland Wiretap Act**
**Md. Code Ann., Cts. & Jud. Proc. § 10-401, et seq.**

79. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

80.     Plaintiff brings this claim individually and on behalf of the Class.

81.     The Maryland Wiretap Act (the "Act") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the willful disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the willful use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. Md. Code Ann., Cts. & Jud. Proc. § 10-402.

82.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. Md. Code Ann., Cts. & Jud. Proc. § 10-410(a).

83.     "Intercept" is defined as any "aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical, or other device." Md. Code Ann., Cts. & Jud. Proc. § 10-401(10).

84.     "Contents" is defined as when "used with respect to any wire, oral, or electronic communication, includes any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication." Md. Code Ann., Cts. & Jud. Proc. § 10-401(4).

85.     "Person" is defined as, in relevant part "any individual, partnership, association, joint stock company, trust, or corporation." Md. Code Ann., Cts. & Jud. Proc. § 10-401(5)(i).

86.     "Electronic Communication" is defined as "any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." Md. Code Ann., Cts. & Jud. Proc. § 10-401(5)(i).

87.     Carnival is a person for purposes of the Act because it is a corporation.

88.     Session Replay Code like that procured by Carnival is a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" within the meaning of the Act.

89.     Plaintiff's and Class members' intercepted Website Communications constitute the "contents" of electronic "communications" within the meaning of the Act.

90.     Carnival willfully procures and embeds Session Replay Code on its website to spy on, automatically and secretly, and intercept its website visitors' electronic interactions communications with Carnival in real time.

91.     Plaintiff's and Class members' electronic communications are intercepted contemporaneously with their transmission.

92.     Plaintiff and Class members did not consent to having their Website Communications wiretapped.

93.     Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 10-410, Plaintiff and the Class members seek (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

94.     Carnival's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with

Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

**COUNT II**
**Invasion of Privacy – Intrusion Upon Seclusion**

95.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

96.     Maryland common law recognizes the tort of invasion of privacy.

97.     Plaintiff brings this claim individually and on behalf of the Class.

98.     Plaintiff and Class members have an objective, reasonable expectation of privacy in their Website Communications.

99.     Plaintiff and Class members did not consent to, authorize, or know about Carnival's intrusion at the time it occurred. Plaintiff and Class members never agreed that Carnival could collect or disclose their Website Communications.

100.     Plaintiff and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

101.     Carnival willfully intrudes on Plaintiff's and Class members' private life, seclusion, or solitude, without consent.

102.     Carnival's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

103.     Plaintiff and Class members were harmed by Carnival's wrongful conduct as Carnival's conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

104.   Carnival's conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality has caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

105.   Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiff and Class members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiff's and Class members' property.

106.   Further, Carnival has improperly profited from its invasion of Plaintiff and Class members' privacy in its use of their data for its economic value.

107.   As a direct and proximate result Carnival's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

108.   Carnival's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members any time they visit Defendant's website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## **REQUEST FOR RELIEF**

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully request that the Court enter judgment in Plaintiff's and the Class's favor and against Defendant as follows:

A.   Certifying the Class and appointing Plaintiff as the Class representative;

B.   Appointing Plaintiff's counsel as class counsel;

C.     Declaring that Defendant's past conduct was unlawful, as alleged herein;

D.     Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E.     Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F.     Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.     Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

H.     Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

I.     Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the Class, demands a trial by jury of any and all issues in this action so triable of right.

Dated: February 24, 2023          Respectfully submitted,

*/s/ James J. Pizzirusso*
James J. Pizzirusso
(Md. Bar No. 20817)
HAUSFELD LLP
888 16th Street N.W.
Suite 300
Washington, D.C. 20006
202.540.7200
jpizzirusso@hausfeld.com

Steven M. Nathan**
HAUSFELD LLP
33 Whitehall Street
Fourteenth Floor
New York, NY 10004
646.357.1100
snathan@hausfeld.com

Katrina Carroll*
LYNCH CARPENTER, LLP
111 W. Washington St.
Suite 1240
Chicago IL 60602
312.750.1265
katrina@lcllp.com

Jonathan M. Jagher*
FREED KANNER LONDON & MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
610.234.6486
jjagher@fklmlaw.com

*Counsel for Plaintiff*
***admission forthcoming*
**pro hac vice forthcoming*